**AMERICAN AUTO INSURANCE CO.,**
Defendant, Appellant,

v.

**UNITED STATES** of America, for the use
and benefit of Alvah C. LUCE, d/b/a
Northern Electric Service & Supply Co.,
Plaintiff, Appellee.

No. 5426.

United States Court of Appeals
First Circuit.

Heard March 3, 1959.

Decided July 24, 1959.

John D. Leddy, Portland, Me., for appellant.

Sidney W. Thaxter, Portland, Me., with whom Royden A. Keddy, Portland, Me., was on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Circuit Judge (Retired).

This is an appeal by the surety on a contractor's Miller Act payment bond from a judgment against it in favor of a subcontractor. Roslyn Construction Company, to which the United States had awarded contract No. NOy–88588 for construction of "Crash Facility and Utilities" at the Naval Air Station in Brunswick, Maine, during the years 1956 and 1957, subcontracted the required electrical work to the use plaintiff, Luce, who does business as Northern Electric & Supply Co.

The subcontract between Roslyn and Luce corresponding to contract No. NOy–88588 was dated May 7, 1956. It contained the usual terms, most of which are wholly irrelevant for the present purposes. It required generally that all work described by certain specifications, including the supplying of materials and labor, be performed by Luce to the satisfaction of Roslyn, the United States Government, the Navy, and the architect. The subcontract established a job price of $7,900 and provided a procedure for approval of "extras"; two such "extras" which were thus approved increased the total amount due under the subcontract to $8,582. The payment provisions, which are central to this case, required that 90 per cent of the total value of work done during each month, as shown by a progress billing submitted on or before the last day of that month, and subject to the approval of the architect, be paid by the 15th day of the following month. Final payment (comprising the retained 10 per cent) was due within 60 days after the completion and final acceptance of the work. The entire article governing payments was subject to an overriding proviso (attached as a rider to the printed subcontract form)

"that in no event shall the Roslyn Construction Co., Inc. be Liable (sic) for payments to the sub contractor (sic) prior to 10 days of receipt by the contractor of payment from the owner on such work performed by the sub contractor (sic) under this contract."

Work under contract NOy–88588 was substantially completed December 17, 1956, and accepted by the Navy on March 18, 1957; final settlement was made between the United States and Roslyn on January 28, 1957, and the final payment was made to Roslyn on February 4, 1957. Meanwhile, Roslyn's payments to Luce were in arrears. Although Luce made progress billings to Roslyn, no bill was paid within the time allowed. The first payment was about thirteen days tardy. A payment of substantially the total due against the second and third progress billings was made almost three months after the third bill should have been paid. Roslyn failed to make any further progress payments or the final payment, so that $7,000 remains due. Luce, commencing in April, 1957, received a note and subsequent renewal notes for the amount due from Roslyn, which Luce in turn endorsed and discounted at his bank.

If this subcontract had pertained to construction work on property of a private owner, Luce would have a lien against that property of the owner to the extent of the $7,000 owed him for labor and materiel. See Maine R.S.1954, c. 178, § 34. Because the Naval Air Station is the property of the United

States Government, however, the statutory lien of a materialman cannot attach. But Congress has provided substitute protection since 1894 (see 28 Stat. 278), which is presently found in the Miller Act, 40 U.S.C.A. § 270a(a) (2). The statute requires that, before any person is awarded any public work or building contract with the United States, and as a prerequisite to such an award, he must furnish (inter alia) a payment bond

> "which shall become binding upon the award of the contract to such person, * * * with a surety or sureties satisfactory to [the officer awarding the contract] for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person."

The bond which Roslyn had to furnish in order to secure its contract NOy–88588 was dated April 30, 1956, and the American Auto Insurance Company was the surety thereon. This bond was conditioned that Roslyn "shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the surety being hereby waived". The bond contains no provision either requiring or excusing notice to the surety of the making, amendment, completion or discharge of any subcontract, or of the default of Roslyn in any regard.

The present litigation was begun by a complaint filed December 16, 1957, invoking the right of action given by the Miller Act, 40 U.S.C.A. § 270a et seq. Both Roslyn and the surety were named as defendants, but the court ordered Roslyn's default entered on August 8, 1958, after it failed to appear at the pre-trial conference. The case was tried without a jury, and at the end of the trial the court orally found for Luce against the surety; subsequently findings of fact and conclusions of law were filed and judgment was entered for Luce in the amount of $7,000, with interest from May 17, 1957, "the date when final payment was due under the terms of the contract between the use plaintiff and Roslyn". The surety has appealed from this judgment, contending that Luce's failure to obtain prompt payment discharged the surety from liability.

■■ It is obvious that the obligation of a surety on a bond furnished under the Miller Act must be determined by federal law; the rule of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, is inapplicable. The Miller Act implements a congressional policy that a bond with surety shall provide protection for persons supplying labor and materials for the construction or improvement of federal property. A suit under the Miller Act does not depend upon diversity of citizenship but is a special, federal right of action limited to the federal court.[1] Bonds given under the Miller Act are not even in the ordinary forms which would be involved in litigation in the state courts; Congress specified their conditions, and they are executed on printed blanks prescribed by the General Services Administration (for example, the bond in suit was executed on Standard Form 25a Revised November 1950), the meaning of which should not vary from state to state. There are no dangers of forum-shopping or of any unseemly deviation in rules of law which it was the policy of the Erie case to avoid.

■■ It therefore seems that the decision of the Supreme Court in Guaranty Co. v. Pressed Brick Co., 1903, 191 U.S. 416, 24 S.Ct. 142, 48 L.Ed. 242, decided

---

1. 40 U.S.C.A. § 270b(b) provides: "Every suit instituted under this section shall be brought in the name of the United States for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed and not elsewhere, irrespective of the amount in controversy in such suit".

under a predecessor of the Miller Act, is fatal to the appellant's position. The subcontractor who furnished the brick to build the Denver Mint sued the contractor and the surety on the payment bond. The surety raised as a defense that it was discharged by the action of the subcontractor "in taking two promissory notes * * * for the amount of the brick company's account, then due and payable, one of said notes running for thirty days and the other for sixty days, and each bearing 10 per cent interest per annum from date". (191 U.S. at page 417, 24 S.Ct. at page 143.) The surety had not alleged that it had suffered an actual financial loss because of the subcontractor's accepting these notes. The Supreme Court answered in the negative the certified question whether the action described discharged the surety, holding that the rule automatically absolving a surety from liability because of an alteration in the contract between the principal and the obligee without the surety's consent is not applicable to bonds such as those under the Miller Act, where the surety has deliberately contracted for an uncertain obligation. This reasoning is clearly applicable to the present case: The bond executed by the surety and Roslyn is dated April 30, whereas Roslyn's subcontract with Luce was not entered into until May 7, a full week later. Thus the surety cannot claim that it entered into its obligation relying on the terms of the subcontract. The only real difference between the cases is that the Pressed Brick contract provided for a single lump sum whereas Luce was entitled to 90 per cent in progress payments, but this is not a meaningful distinction. Both cases involve an extension of time for payment, achieved by similar transactions, and the fact that the extension in Luce's case applied to several partial payments, and in Pressed Brick's case it only applied to one grand payment, is wholly irrelevant. The final result is even the same. Moreover, when the appellant surety undertook to guarantee the bond, it could not know that Luce and Roslyn would contract for prog-

ress payments. See also United States, to Use of J. B. Van Sciver Co. v. United States Fidelity & Guaranty Co., C.C.E.D. Pa.1910, 178 F. 721; United States, to Use of Noland Co., Inc. v. Maryland Casualty Co., D.C.D.Md.1941, 38 F.Supp. 479. Actual prejudice must also be shown under Maine law. Maine Central R. Co. v. National Surety Co., 1915, 113 Me. 465, 94 A. 929, L.R.A.1916A, 881.

In American Bonding Co. of Baltimore v. United States, to Use of Francini, 3 Cir., 1916, 233 F. 364, 368, upon which appellant relies, the contractor and subcontractor agreed shortly after the contract was made that, instead of cash progress payments for the amounts specified, the subcontractor would accept notes for "amounts differing from the sums that would have been due [in cash]", which new amounts were substantially greater. For example, for work priced in the subcontract at $55,400, the subcontractor received notes and cash totalling nearly $75,000. That very great augmentation in the price (and consequently in the surety's risk) and the long extension of time combined might require the inference that there must have been actual harm to the surety; it follows that the case can give no comfort to the appellant here.

■ Fidelity & Deposit Co. v. Agnew, 3 Cir., 1907, 152 F. 955, and Justice v. Empire State Surety Co., D.C.E.D.Pa. 1913, 209 F. 105, the other federal law cases cited, were suits on performance bonds where there had been anticipatory payments by the obligee-owner to the principal. There is no uncertainty when a performance bond is guaranteed—the owner and contractor are known and the contract terms are ascertainable at least —and the payments run from rather than to the obligee, so that, as long as the obligee retains a certain amount of the contract price in his hands, he cannot lose that sum and the surety cannot become liable for it. The fund created by the amounts retained might be able to make good the whole or a part of any damages for which the surety would otherwise be responsible. See Fort Worth

Independent School District v. Aetna Casualty & Surety Co., 5 Cir., 1931, 48 F.2d 1, 77 A.L.R. 222.

The court below found as a fact: "8. There was no actual prejudice to the surety, American Auto Insurance Co., by said extension of time for payment or by any variations in the method of payment required by * * * the subcontract." [165 F.Supp. 134.] On the record before us, the quoted finding cannot possibly be set aside as clearly erroneous.

The surety produced no direct proof of harm suffered by it because Luce failed to obtain prompt cash progress payments. Its only attempt to meet this burden has been a disingenuous argument in its appellate brief that there must have been prejudice, since strict compliance with the subcontract schedule would have meant that at least 90 per cent of the price would have been paid by early 1957. Actual prejudice might have been proved by evidence that Luce's failure to insist on prompt cash progress payments left in Roslyn's hands a sum of money which could have been used to pay Luce or other subcontractors, but was in fact wasted. Compare Piel Construction Co. v. Commonwealth of Pennsylvania, to Use of Hendricks, 3 Cir., 1929, 35 F.2d 265. But there is no such showing. For all that appears in the record, Roslyn may have used all the payments from the Navy to discharge debts for which the surety would have been liable; in fact, the testimony was that the only other claim against the surety on this bond is for a few hundred dollars. It was not even proved that the surety would have been in any better position if Luce had, for example, on June 28 (when Roslyn was first in arrears) stopped work and made claim on the surety, brought suit, or taken other drastic action, and no doubt one reason for the Miller Act's requirement of a surety bond is to obviate the necessity for such action.

The following were the amounts due and paid under the subcontract:

| Date | Due | Paid | Balance |
|---|---|---|---|
| 1956, June 27 (approx.) | $ 525.45 | | $ 525.45 |
| July 10 | | $ 525.45 | 0 |
| " 21 " | 696.60 | | 696.60 |
| Aug. 15 | 361.32 | | 1,057.92 |
| Sept. 15 | 50.39 | | 1,108.31 |
| Oct. 15 | 535.23 | | 1,643.54 |
| Nov. 6 | | 1,056.55 | 586.99 |
| " 15 | 804.59 | | 1,391.58 |
| Dec. 15 | 1,000.11 | | 2,391.69 |
| 1957, Jan. 15 | 2,420.22 | | 4,811.91 |
| Feb. 15 | 1,329.89 | | 6,141.80 |
| [May 17] | 858.20 | | 7,000.00 |
| TOTAL | $8,582.00 | $1,582.00 | $7,000.00 |

As of November 6, 1956, Luce had received from Roslyn $1,582.00, which was approximately three quarters of the money then due; as of then Luce can scarcely have been expected to take any action against Roslyn. Thereafter the rate of work accelerated and no further payments were made, so that the amount due had increased more than tenfold by February 15, 1957. Luce testified that he frequently protested Roslyn's failure to pay, but the latter always replied that the Navy had not yet paid it the amount due on its progress billings. Of course the rider to the subcontract made that a good excuse; since Roslyn kept blaming

the delay on the Navy and promising that as soon as the Navy would "pay off" Luce would be paid in turn, Luce could not be charged with knowledge that Roslyn was in default unless he knew or should have known that the Navy had actually paid Roslyn. Luce further testified that he tried (with what seems to have been due diligence) to discover whether Roslyn had received payment: In December, 1956, he called the Navy office in Brunswick, and in January or February, 1957, he got in touch with the Navy in Boston, but both times he was refused information on the ground that it was contrary to Navy policy to reveal to a subcontractor the affairs of the contractor. In these circumstances Luce can scarcely be charged with having acted unreasonably in not notifying the surety.[2]

In April, 1957, Luce redoubled his efforts to secure payment from Roslyn; he had exhausted his borrowing power at his bank and needed operating capital. Roslyn still said it did not have the money at that time and offered a promissory note "as a temporary expedient". Roslyn made a three-month note for $7,000 which, with Luce's endorsement, the bank discounted; Roslyn reimbursed Luce for the discount expense. Similar renewal notes dated July 2 and October 2 were substituted, but Roslyn paid only another $50 against the discount cost; when the October 2 note came due, the bank was willing to accept only a two-month note (dated December 1) for $5,000, and Luce held another note for the balance. Of the total discount expense of $365, Roslyn paid $155, or roughly the discount (at six per cent) on $7,000 for 134 days. Luce, however, never assented to these notes as a substitute for cash but continued insisting on payment.

Meanwhile, the work under a second Roslyn-Luce electrical subcontract under another Navy-Roslyn contract at the Brunswick Naval Air Station reached the point at which Luce had to purchase and install special, expensive equipment, and before making this investment Luce wished to be assured that he could collect what Roslyn owed him. There is some dispute as to a notification by telephone, but the surety admits that Luce notified it in writing on October 14, 1957, of Roslyn's default. In due course the surety refused to pay and the present suit resulted.

Assuming that Luce should have known that Roslyn was technically in default, there certainly was no express requirement of notice to the surety, and none can be implied unless a reasonable man in Luce's position would have realized that Roslyn would not ever make payment and so would have notified the surety. Luce could well have been acting reasonably in all the circumstances in not making a claim against the surety until October, 1957. Hence it is difficult to say that there was any material variation from the contract, except that Roslyn failed to meet its debts, the risk against which (as the Miller Act requires) the surety's obligation insured Luce. In any event, the surety completely failed to prove that it was in fact harmed by Luce's actions.

 In one minor respect we must hold that the court below erred, since the judgment awarded interest from the wrong date.[3] The recovery of interest in actions under the Miller Act depends on the law of the state in which the contract is to be performed. Robinson v. United States, for Use of Brown-Ketcham Iron Works, 2 Cir., 1918, 251 F. 461; United States, to Use of Noland

2. The surety's attempt to prove on cross-examination that Luce delayed notification in order to accommodate Roslyn failed completely.

3. The subcontract required final payment sixty days after March 18, when it is agreed the work was accepted, or on May 17, 1957. As stated above, Luce had the use of his $7,000 for a period of 134 days during which Roslyn paid the discount expense. If interest is recovered for this time it would be in effect a double payment of interest. Therefore, interest could not start before 134 days from May 17, or September 28, 1957; even if there were no further error.

Co., Inc. v. Maryland Casualty Co., supra, D.C.D.Md.1941, 38 F.Supp. 479; United States, for the Use of Magnolia Petroleum Co. v. H. R. Henderson & Co., D.C. W.D.Ark.1955, 126 F.Supp. 626, 637. In Maine interest is allowed from the time when the defendant has a duty without further demand to pay over a sum certain to the plaintiff, Bither v. Packard, 1916, 115 Me. 306, 98 A. 929; Hall v. Huckins, 1856, 41 Me. 574. This means that interest can be charged against the surety only from the date of demand on it, because until then the surety is not in default. See United States, for Use of Baltimore Cooperage Co. v. McCay, D. C.D.Md.1928, 28 F.2d 777 (applying Maryland law, which is like the law of Maine). In the ordinary case the surety will also be liable for the interest owed by the principal from the date that the latter is in default, so that the distinction may be academic.

■ Yet in this case the earliest notice conceded by the surety and found by the district court to have been given by Luce to the surety was the written notice of October 14, 1957. Although as we have held this delay was reasonable, until that time, a period of some months, Luce chose to look to the principal rather than notify the surety and thus disabled the surety from stopping the accumulation of interest. It is clear that under Maine law this delay from May 17 to October 14 was at Luce's own risk, and the surety cannot be charged with interest then accruing. See Maine Central R. Co. v. National Surety Co., 1915, 113 Me. 465, 94 A. 929, L.R.A.1916A, 881.

The letter of October 14, 1957, was a sufficient demand even though it concluded: "As you stated over the phone, it will take a few days for you to look into the matter, therefore, we will wait a few days to hear from you, before filing a formal claim." [4] That letter gave notice to the surety of Roslyn's default, of all relevant details, and of the fact that

Luce looked to the surety for payment. The "few days" grace therein referred to seems to have been a mere courtesy in the hope of avoiding some feared "red tape."

A judgment will be entered vacating the judgment of the District Court and remanding the case to that Court with directions to enter judgment for the use plaintiff in the sum of $7,000.00, with interest at six per cent from October 14, 1957. The appellee will recover the costs of this appeal.

---

4. December 6, 1957, was the date of a letter apparently intended as the "formal claim", which stated, "we hereby register and enter our claim against your Company for immediate payment of the above $7,000.00, still due us on our Electrical Sub-Contract".