**UNITED STATES of America, for the use and benefit of INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff,**

v.

**HARTFORD FIRE INSURANCE COMPANY; R.P. Richards, Inc. d/b/a/ Richards Construction Company, Defendants.**

No. 99–00437 DAE.

United States District Court,
D. Hawai‘i.

July 19, 2000.

Kenneth R. Kupchak, Damon Key Bocken Leong & Kupchak, Honolulu, HI, for International Business Machines Corporation, United States of America for the use and benefit of, plaintiffs.

Harvey J. Lung, Darren S Matsuda, Bays Deaver Hiatt Lung & Rose, Honolulu, HI, for Hartford Fire Insurance Company, R.P. Richards, Inc. dba R.P. Richards Construction Company, defendants.

*ORDER DISMISSING DEFENDANT HARTFORD FIRE INSURANCE COMPANY'S COUNTER MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF INTERNATIONAL BUSINESS MACHINES CORPORATION'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING PLAINTIFF UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF INTERNATIONAL BUSINESS MACHINES CORPORATION'S MOTION TO STRIKE DEFENDANT HARTFORD FIRE INSURANCE COMPANY'S DISCLOSURE OF EXPERT WITNESSES AND PRECLUDE EXPERT TESTIMONY AS MOOT*

DAVID ALAN EZRA, Chief Judge.

The court heard arguments on July 18, 2000. Kenneth R. Kupchak, Esq., appeared at the hearing on behalf of Plaintiff; Harvey J. Lung, Esq., and Darren S. Matsuda, Esq., appeared at the hearing on behalf of Defendant Hartford Fire Insurance Company. After reviewing the cross-motions and the supporting and opposing memoranda, the court GRANTS in part and DENIES in part Plaintiff's Cross-Motion for Summary Judgment, DISMISSES Defendant's Counter Motion for Summary Judgment and GRANTS Plaintiff's Motion to Strike Defendant Hartford Fire Insurance Company's Disclosure of Expert Witnesses and Preclude Expert Testimony as moot.

## BACKGROUND

In this civil case, International Business Machines Corporation ("IBM") seeks enforcement of a payment bond under the Miller Act, 40 U.S.C. § 270a et seq., under which Defendant Hartford Fire Insurance Company ("Defendant") is the surety.

On March 26, 1996, R.P. Richards Construction Company ("Richards") entered into a valid contract with the United States of America to construct the Industrial Waste Treatment Complex for Navy, Public Work Center, Phase III, at Pearl Harbor, Hawaii ("Project"). Then, on April 3, 1996, pursuant to the Miller Act, Defendant issued a payment bond naming Richards as the principal, and delivered it to the Government. In the agreement, Defendant contracted to pay any "first-tier" subcontractors, including IBM, for all supplies and labor necessary for the construction of the Project that were not paid for by Richards, up to $2,500,000.[1] Impor-

---

1. The Obligation and Conditions Clauses of the Bond provide:

OBLIGATION:

We, the Principal and Surety(ies) are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any au-

tantly, however, the bond was issued before Richards entered into any subcontract or purchase order agreements with other parties, including the IBM subcontract. Therefore, Defendant did not rely on any subcontracts or purchase orders when it issued the Miller Act bond; rather, it simply agreed to protect any suppliers of labor and materials to the Project.

Then, on July 11, 1996, Richards entered into a subcontract with IBM, wherein IBM agreed to "furnish and install, among other things, a process instrumentation and control system, . . ., for the construction of the [Project]" in exchange for a total subcontract price of $1,340,000. During the performance of the subcontract, Richards and the Navy authorized necessary changes to IBM's work, which increased the cost of IBM's performance. As a result, IBM claims that "IBM and Richards agreed that IBM was entitled to an equitable adjustment for those increased costs under the Subcontract." IBM asserts that its added costs equaled $350,000 and the parties negotiated the "extra work claims" in May of 1998.

According to IBM, Richards requested a modification to the subcontract's payment clause during the negotiations[2] and the parties "reached an agreement in which [they] compromised IBM's extra work claims to the amount of $175,000." Defendant was never informed about this equitable adjustment claim. Then, on September 1, 1998, the above "agreement" was

reduced to writing, titled "Payment," as a revision to the payment clause of the original subcontract.[3] In this new payment agreement, Richards and IBM agreed that Richards owed IBM $1,203,726.22, which is the value of IBM's labor and materials under the subcontract and approved change orders less the $239,691.78 that Richards had already paid IBM. Further, Richards agreed to pay the sum in twelve monthly installments of $98,144.67.

In addition to the payment for labor and supplies, however, Richards contracted to pay IBM an extra "$175,000 in consideration of the [ ] extended payment agreement and release of any claim heretofore asserted by Subcontractor against Contractor related to this agreement," to be paid in twelve monthly installments of $14,583.34. IBM claims that this latter provision's addition of $175,000 to the subcontract price reflected the "equitable adjustment" for services rendered. However, Defendant contends that it was simply for the "extension of time to pay off the debt and for the settlement of IBM's equitable claims." Moreover, Defendant was never informed of these negotiations during or after they occurred, nor has it ever consented to or authorized the payment clause revision.

Though the original subcontract stated that the Project was to be completed by July 10, 1998, the payments to IBM were scheduled to commence on September 1, 1998, and continue for twelve months.

---

thorized modifications of the contract that are subsequently made. Notice of those modifications to the Surety(ies) are waived.

2. Richards requested this modification because it was experiencing financial difficulties at the time and could not pay IBM under the normal provisions of the initial subcontract. After beginning work on August 1, 1996, IBM billed Richards three times, in August, November and December, for a total of $268,603. However, Richards did not pay any of these invoices. In April 1998, Richards notified IBM that it was experiencing financial difficulties. At this time, Richards owed $978,444.11 to IBM for its work performed on the Project.

3. Defendant claims that this "Extended Payment Agreement" was a new contract, not a revision to the original contract, based on the fact that IBM canceled and credited four invoices to Roberts past due on the Subcontract before entering into the new debt payment agreement. However, the debt agreement was still based on the work and supplies for the Project and the language on the writing conveys that it is an amendment, as it states, "[b]ased on discussion between R.P. Richards, Inc. and IBM concerning Subcontract . . ., it is agreed that Subcontract Section 4 regarding Payment shall be replaced by the following . . ."

Pursuant to the agreement, Richards made the first three payments of $112,738.01. However, it stopped making payments in November of 1998,[4] even though it still owed $990,541.97 under the revised payment clause of the subcontract.[5] As a result, IBM notified Defendant on December 30, 1998 of Richards' non-payment of the subcontract and its bond claim. This notification was the first notice that Defendant received from IBM concerning Richards' non-payment of the subcontract.

It is important to note that IBM's performance on the subcontract continued until at least October 2, 1998, when Richards authorized it via letter to "proceed with the additional work approved in the Prime Contract Modification [00025]." Further, IBM filed the instant Complaint on June 17, 1999. Also, pursuant to a Rule 16 Scheduling Conference, Magistrate Judge Yamashita set May 11, 2000 as the deadline for dispositive motions.

Plaintiff filed its Motion for Summary Judgment on April 28, 2000 and then filed its Motion to Strike Disclosure of Expert Witnesses and Preclude Expert Testimony on June 14, 2000. Then, on June 30, 2000, Defendant filed its Oppositions to both Motions, and filed a Cross–Motion for Summary Judgment. Finally, on July 7, 2000, IBM filed its Reply Briefs and its Opposition to Defendant's Cross–Motion.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the court must bear in

---

4. Since the Project, Richards suspended all construction projects in Hawaii and is now insolvent.

5. This amount is arrived by taking into account the fact that Richards paid IBM

$43,750.02 pursuant to the $175,000 provision of the payment clause, and $294,434.01 pursuant to the $1,203,726.22 provision of the payment clause.

mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. 2505. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

## DISCUSSION

This Order considers three Motions and the court will discuss each in turn.

### A. *Defendant's Cross–Motion for Summary Judgment*

■ Defendant filed its Cross–Motion on June 30, 2000, nearly two months after the deadline imposed by the Rule 16 Scheduling Order. As a result, IBM argues that it should be dismissed since it is untimely.

The Scheduling Conference Order, as amended, states that all dispositive motions in this case shall be filed by May 11, 2000. Importantly,

[t]he scheduling order "control[s] the subsequent course of the action" unless modified by the court. Fed.R.Civ.P. 16(e). Orders entered before the final pretrial conference may be modified upon a showing of "good cause," Fed.

R.Civ.P. 16(b).... [*see*] *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1104 (9th Cir.1985) (court may deny as untimely a motion filed after the scheduling order cut-off date where no request to modify the order has been made); *see also Dedge v. Kendrick,* 849 F.2d 1398 (11th Cir.1988) (motion filed after the scheduling order cut-off date is untimely and may be denied solely on that ground).

*Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 608 (9th Cir.1992).

Here, Defendant filed its cross-motion for summary judgment on June 30, 2000, well after the court imposed deadline. Although Defendant was well aware of the deadlines imposed by the Scheduling Order, it did not specifically request that the court modify its Scheduling Order, nor did it seek relief from the Scheduling Order. Furthermore, although Defendant may argue that this court should consider its summary judgment cross-motion as a de-facto motion to amend the Scheduling Order, it failed to show "good cause" for the untimely cross-motion.

Moreover,

Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension" ... the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson,* 975 F.2d at 609 (citations omitted).

Here, Defendant does not set forth any explanation for its untimely motion.[6] Defendant could have filed a cross-motion for

---

6. Defendant Hartford relies on Local Rule 7.9 in support of its late filing since it allows a counter motion to be filed along with a party's opposition as long as it relates to the subject matter of the original motion. However, this argument is misplaced since coun-

ter-motions are still subject to the Rule 16 deadline unless the party has no basis for knowledge of an argument made in the original motion. Here, Defendant had knowledge of all the necessary arguments prior to the motions deadline.

summary judgment at any time before May 11, 2000. It was fully aware of any arguments in support of a summary judgment motion well before the dispositive motion deadline. Thus, the court finds that Defendant did not conduct the necessary due diligence which could show good cause to amend the deadline.

As the Ninth Circuit has held,

A scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." ... Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation and its standards may not be short-circuited.

*Johnson,* 975 F.2d at 610 (citations omitted).

Thus, since the deadline for filing dispositive motions in this case was May 11, 2000, and Defendant's Counter Motion was not filed until June 30, 2000, this court DISMISSES Defendant Hartford Fire Insurance Company's Counter Motion for Summary Judgment.

### B. *IBM's Motion for Summary Judgment*

In its Motion, IBM argues that the court should grant summary judgment since it "has established all the prerequisites for payment under the [Miller Act] Bond ... [and] Hartford lacks any good faith basis for refusing to pay amounts under the [b]ond." However, Defendant contends that summary judgment should be denied since its bond obligations were extinguished or exonerated by the payment clause revision because the "revision" constituted a new contract or novation and material issues of fact exist, or in the alternative, because of Plaintiff's unfair dealing that resulted in prejudice to Defendants.

Under the Miller Act, 40 U.S.C. § 270a(a)(2), a general contractor on a federal construction project must post a bond to protect all suppliers of labor and material for the project.[7] *United States for Use and Benefit of Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.,* 750 F.2d 759, 760–61 (9th Cir.1984), *cert. denied, Harvis Construction, Inc. v. U.S. ex rel. Martin Steel Constructors, Inc.,* 474 U.S. 817, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985). "The purpose of the Act is to protect persons supplying materials and labor for federal projects, and it is to be construed liberally in their favor to effectuate this purpose." *Id.* at 761 (citing *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.,* 417 U.S. 116, 124, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974)). In ordinary private construction contracts, a supplier of labor or materials can secure a mechanic's lien against the improved property under state law. However, since such suppliers on Government projects are not afforded that option, the Miller Act was created to provide them with an alternative remedy to protect their interests. *F.D. Rich,* 417 U.S. at 122, 94 S.Ct. 2157.

---

7. 40 U.S.C. § 270a(a)(2) states:

Before any contract for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":

(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person. The amount of the payment bond shall be equal to the total amount payable by the terms of the contract unless the contracting officer awarding the contract makes a written determination supported by specific findings that a payment bond in that amount is impractical, in which case the amount of the payment bond shall be set by the contracting officer. In no case shall the amount of the payment bond be less than the amount of the performance bond.

Further, it is well-established that "the obligation of a surety on a bond furnished under the Miller Act must be determined by federal law." *American Auto Insurance Co. v. United States, for the Use and Benefit of Luce,* 269 F.2d 406, 408 (1st Cir.1959); *see also, Continental Casualty Co. v. Schaefer,* 173 F.2d 5, 8 (9th Cir.1949) ("On the issue of Continental's liability on the payment bond, the federal law should control because the determination of the extent of the liability involves the construction of a federal statute, the Miller Act, under which it was created").[8]

Under the Act, a supplier of labor or materials may bring suit on the bond for any unpaid amounts owing for labor or materials. *Avanti,* 750 F.2d at 761. When a prime contractor fails to pay a subcontractor, the following remedy in section 270b(a) applies:

Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under sections 270a to 270d of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him.

40 U.S.C. § 270b(a). Importantly, though, the Act requires that the suit must be commenced within "one year after the day on which the last of the labor was performed or material was supplied by him." 40 U.S.C. § 270b(b).

 To establish a prima facie case under section 270b, a subcontractor supplying labor or materials must prove four elements:

(1) the materials were supplied in prosecution of the work provided for in the contract;

(2) he has not been paid;

(3) he had a good faith belief that the materials were intended for the specified work; and

(4) the jurisdictional requisites were met.

*Avanti,* 750 F.2d at 761 (citing *United States ex rel. Carlson v. Continental Casualty Co.,* 414 F.2d 431, 433 (5th Cir.1969)).

In this case, it is clear that IBM has provided sufficient evidence to meet this standard for recovery under the Miller Act bond. First, it is undisputed that IBM supplied labor and materials pursuant to the Project. Second, though it has been paid for some of its services, it is also undisputed that Richards, the prime contractor, has not paid IBM for all the labor and materials despite repeated demands for payment. Third, it is undisput-

---

**8.** Defendant cites *K–W Industries v. National Surety Corporation,* 855 F.2d 640 (1988) to support the proposition that the Ninth Circuit has held that "the Miller Act does not preempt nor preclude state law claims or remedies" and it does not regulate surety law. *Id.* Further, they argue that because there is no clear federal law on the issues, the court should look to state surety law in determining this case. Defendant's cite, however, is misleading since the *K–W Industries* case merely holds that the Miller Act "does not supplant any other remedies the supplier may have against any other party involved in a federal construction project." *Id.* at 643 ("the Miller Act, like the mechanic's lien it replaces, 'is

not the exclusive remedy in regard to the obligation which such lien secures'") Therefore, while the case protects the subcontractors' rights outside the Miller Act, it does not overrule the *United States Fidelity* rule that normal surety defenses usually do not apply to Miller Act cases when the surety contracts for uncertain liability. *United States Fidelity & Guaranty Co. v. United States,* 191 U.S. 416, 425, 24 S.Ct. 142, 48 L.Ed. 242 (1903). Further, it never speaks to the applicability of a surety's rights or defenses under the Act, since the case covered a subcontractor attempting to sue in tort for alleged bad faith by the surety. *K–W Industries,* 855 F.2d at 642–43.

ed that IBM had a good faith belief that the labor and materials were intended for the Project. Lastly, IBM has met all jurisdictional notice and filing requisites, since it notified Defendant and filed its Complaint before the one-year statute of limitations expired. Specifically, IBM finished work on the Project no later than October 2, 1998, as this represents the date of the final work approval by Richards, it notified Defendant on December 30, 1998, and it filed the Complaint on June 17, 1999.

■ Nevertheless, Defendant argues that it is not liable on the bond since it was discharged of its bond obligations when IBM and Richards extended the payment period and increased the contract amount via the revision of their contract's Payment clause. Defendant further contends that general surety law defenses exonerate it from its obligations. However, this argument is misplaced because the normal surety defenses available for new contracts and alterations to contracts between contractors and subcontractors do not apply to Miller Act cases when, as here, the surety enters into a bond agreement with no knowledge of the subcontractor's identities or reliance on any subcontract agreements.

■ As the *American Auto* court holds, [t]he rule automatically absolving a surety from liability because of an alteration in the contract between the principal and the obligee without the surety's consent is not applicable to bonds such as those under the Miller Act, where the

surety has deliberately contracted for an uncertain obligation.

*American Auto*, 269 F.2d at 409 (citing *United States Fidelity*, 191 U.S. 416, 24 S.Ct. 142).[9] A surety, under the Miller Act, necessarily enters into its obligation under the bond prior to the execution of any subcontracts, and as a result, it "cannot claim that it entered into its obligation relying on the terms of the subcontract." *Id.; see also, United States Fidelity*, 191 U.S. at 425, 24 S.Ct. 142 (Under the Miller Act, "[t]he guarantor is ignorant of the parties with whom his principal may contract, the amount, nature, and the value of the materials required, as well as the time when payment for them will become due.... [Thus], [i]f a person deliberately contracts for an uncertain liability, he ought not to complain when that uncertainty becomes certain."). However, a surety's obligation under a Miller Act bond may be absolved by an alteration in the contract between the principal and obligee in cases involving unfair dealing or fraud on the part of the subcontractor, or alterations not within the scope of the original contract.[10] *United States Fidelity*, 191 U.S. at 426, 24 S.Ct. 142.

■ Here, Defendant did not know of, let alone rely on, the payment terms of the original IBM–Richards subcontract. Additionally, Defendant offers no convincing evidence[11] of fraud or unfair dealing by IBM in their dealings with Richards surrounding the revision to the payment clause, as IBM was simply attempting to obtain the payment it was due under the contract in an efficient manner. As a re-

9. While the *American Auto* and *United States Fidelity* cases interpret and analyze the Heard Act, which is the predecessor to the Miller Act, the analysis applies to the Miller Act and this case because the Heard Act contained the same substance as the present Miller Act.

10. Defendant also argues that "prejudice" to a surety caused by an alteration to the subcontractor-contractor contract, delay in notice to the surety, and a contractor's insolvency is grounds for exoneration, based upon *United States Fidelity*. However, this argu-

ment is misplaced since that case left open the question because the facts of the case did "not call for an expression of opinion as to whether" such facts justified exoneration.

11. Defendant does offer evidence that IBM entered into the extended payment agreement with Richards and included a clause increasing the amount of payment to reflect the allowance for more time and a release of claims. This evidence alone, even in a light most favorable to Defendant, does not rise to unfair dealing or fraud by IBM.

sult, it is not exonerated from its obligations under the bond, to the extent they cover IBM's labor and services rendered, merely because the parties changed the method or timing of payment, even if the revision is considered a material alteration or a new contract. This remains true even though Defendant may have been prejudiced by the revision because Defendant agreed to pay for IBM's labor and services without knowledge of the terms, amount or manner of payment, and assumed the risk of Richards' insolvency.[12]

■ Additionally, Defendant claims that it should be exonerated since IBM failed to notify Defendant of the revisions to the subcontract. This argument is misplaced, though, because notice to the surety under a payment bond is not required unless the revision goes beyond the scope of the labor and services necessary for the bonded project. *American Auto,* 269 F.2d at 409. Further, Hartford expressly waived notice to "authorized modifications," or modifications directly related to labor and materials, including change orders, in the "Conditions" clause [13] of the bond agreement with Richards. Lastly, the subcontract between IBM and Richards includes a clause, consistent with the Miller Act, permitting revisions to the scope of the work without notice to sureties.

Here, it is clear that at least a portion of the revision covers labor and materials provided to the Project, as the clause states, in pertinent part: "[t]his clause is based on Owner acceptance of Subcontractor's work under this Agreement ... [and][t]he total value of this Agreement through and including Change Order "J" ... is $1,443,418.... Contractor agrees to

pay Subcontractor balance due of $1,203,726.22." Defendant does not dispute the fact that this figure relates to labor and materials provided pursuant to the Project. As a result, IBM's failure to notify Defendant of the revision to the payment terms surrounding these expenses does not release Defendant from its obligations under the bond to the extent the revision covers payment for labor and materials.

Thus, Plaintiff's Motion is GRANTED to the extent the payment clause revision covers the payment of labor and services rendered under the original subcontract and change orders, which is a sum total of $909,292.21.[14]

■ However, Defendant claims that it should nonetheless be exonerated from its obligations to IBM under the bond contract since the payment clause revision also makes alterations not within the scope of the original contract when it provides for an extra $175,000 to IBM "in consideration of the above extended payment agreement and release of any claim heretofore asserted by Subcontractor against Contractor related to this Agreement." Defendant contends that since this additional consideration does not cover "labor or materials" and it was not a risk that Defendant agreed to or reasonably contemplated, Defendant should be released from its bond obligations.

In response, though, IBM claims that the "release of claims" language referred to IBM's release of its equitable adjustment claim arising from extra work performed on the contract. IBM further argues that the additional terms are not

---

12. "Prejudice" to the surety alone does not exonerate it under the bond agreement unless it is coupled with fraud, unfair dealing by the subcontractor, or a change outside the scope of the original contract.

13. The clause reads: "The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal *for furnishing labor, material or both in the prosecution of the work* pro-

vided for in the contract identified above, and any *authorized modifications* of the contract that are subsequently made. *Notice of those modifications to the Surety(ies) are waived.*" (emphasis added)

14. This figure is arrived at by subtracting the payments of $294,434.01 from the original amount due under the payment clause, which was $1,203,726.22.

outside of the scope of the original contract since they are in lieu of an increase in the contract price for labor and material provided by IBM under the contract. Specifically, Richard Smith, IBM's Contract Relations Advisor, states, via affidavit, that the "release of claims" clause reduced to writing an agreement between IBM and Richards "in which the parties would compromise IBM's extra work claims to the amount of $175,000".

Under principles of contract law, "the interpretation of contract language is a matter of law, and therefore appropriate in a pretrial motion such as a motion for summary judgment." *P.W. Stephens Contractors, Inc. v. Mid American Indemnity Insurance Company*, 805 F.Supp. 854, 858 (D.Haw.1992) (citation omitted). Further, "absent an ambiguity, the terms of a [contract] should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Id.* at 857.

After reviewing the record, the plain language of the payment clause revision provides that the $175,000 increase in the subcontract amount is in consideration of two things: (1) the extended payment agreement; and (2) release of any claim heretofore asserted by IBM against Richards related to the original subcontract. Since the extended payment agreement itself is not "labor and materials," it is clear that at least a portion of the revised payment clause amount is beyond the scope of the original subcontract since it does not cover solely labor and materials provided by IBM.

As for the "release of claims" language, however, the clause is ambiguous because there is no description of the nature of the claims "asserted by IBM." Thus, a resort to extrinsic evidence is necessary. The uncontroverted evidence provided by IBM shows that the language refers to "extra work" claims related to labor and materials provided for the Project. As a result, this portion of the additional consideration is within the scope of the original agreement since it covers "labor and materials" provided by IBM.

Consequently, while it is clear that a portion of the additional $175,000 covers labor and materials provided for the Project and is thus covered by the bond, there is a question of fact as to the exact amount since it was also given in consideration of the extension of time for payment by Richards, which is not "labor or materials." Thus, the court GRANTS Plaintiff's Motion, but only to the extent that Defendant is liable under the bond for payment of the additional consideration apportioned to "labor and materials" provided for the Project. As a result, the court DENIES Plaintiff's Motion as to the amount of damages under the disputed clause since there is a question of material fact surrounding the correct apportionment. Accordingly, the finder of fact must determine how much of the $175,000 is attributable to "labor and materials" provided to the Project and how much is attributable to the extension of time for payment.

Finally, Defendant argues that it should be exonerated from its obligations under the bond since it was prejudiced when IBM failed to notify Defendant about Richards' financial difficulties and failure to pay installments of the subcontract. Under the Miller Act, even if the subcontractor knows that a contractor is technically in default, there is

> no express requirement of notice to the surety, and none can be implied unless a reasonable man in [the subcontractor's] position would have realized that [the contractor] would not ever make payment and so would have notified the surety.

*American Auto*, 269 F.2d at 411. Importantly, neither the bond agreement, nor the subcontract, imposed any such duty to notify on IBM, either. Further, even if there is a technical default and/or alteration to the original contract, and the subcontractor unreasonably fails to notify the surety, the surety must still prove that it was in fact harmed by the parties' conduct

before it may be exonerated from any obligations under the bond. *Id.*

Here, Defendant also argues that IBM should have notified Defendant of Richards' financial difficulties at an earlier time so that Defendant could have mitigated its liability under the bond. Further, it claims that IBM's failure to timely notify Defendant of Richards' financial difficulties and failure to make payments prejudiced it and, as a result, exonerated Defendant of its obligations under the bond.

However, Defendant offers no evidence that IBM knew or should have known that Richards would never make its payments. Rather, Richards assured IBM during negotiations for the revised payment clause that, despite past defaults on progress payments, it would be able to make regular payments under the extended payment agreement. Then, within a month after Richards failed to make its fourth payment under the extended payment agreement, IBM notified Defendant of the default and later filed its claim within the statutory period. Thus, IBM notified Defendant almost immediately after it became clear to IBM that Richards "would not ever make payment." As a result, IBM fulfilled its duty to Defendant under the Miller Act, notwithstanding the fact that Defendant may have been prejudiced by any delay in notification. To hold otherwise would discourage settlements and negotiations with the original parties to a contract and could potentially cause unnecessary litigation between the sureties, contractors and subcontractors.

Thus, for the foregoing reasons, Plaintiff's Motion is GRANTED in part and DENIED in part, as the court must still determine how much of the additional consideration for the $175,000 payment is attributable to "labor and materials" provided by IBM for the Project.

■ In addition to the amount due under the bond, Plaintiff also claims that they are entitled to interest on the amount, attorney's fees and costs. First, it contends that interest is authorized by both the subcontract and the bond itself. Under the subcontract, FAR 52.232–5 and 31 U.S.C. § 3901, which provide for interest on outstanding amounts unpaid by the contractor, are incorporated by reference. Further, prejudgment interest, as determined by state law, is within the appropriate "scope of the remedy" under the Miller Act. *United States for Varco Pruden Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915, 922 (5th Cir.1998). Under Hawaii Revised Statutes §§ 636–16 and 478–2, an unpaid claimant is entitled to an interest rate of ten percent per year on the unpaid balance. Here, it is clear that Richards failed to pay IBM under the subcontract and IBM may recover prejudgment interest. As a result, Plaintiff's Motion is GRANTED to this extent and Defendant is ORDERED to pay prejudgment interest on the unpaid balance, as determined by the court, in the amount of ten percent per year.

■ Second, IBM contends that it is also entitled to reasonable attorney's fees and costs under section 38 of the subcontract. This section provides:

> If one party to this Agreement institutes litigation or arbitration with the other party, or against the surety of either party, arising out of the terms and conditions of this Agreement, or performance under this Agreement, the prevailing party shall be entitled to recover from the other party all associated costs including court costs and reasonable attorney's fees.

Importantly, attorney's fees and costs are recoverable under the Miller Act if provision for such fees and costs is part of a valid contract or subcontract under the Act. *Travelers Indemnity Co. v. United States for Use and Benefit of Western Steel Co.*, 362 F.2d 896, 899 (9th Cir.1966); *United States ex rel. Maddux Supply Co. v. Saint Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 336 (4th Cir.1996).

Here, the subcontract clearly provides for the provision of attorney's fees and

costs to the prevailing party of litigation "arising out of the terms and conditions" of the agreement. This action is clearly covered by the provision since IBM is suing Defendant, who is the surety of a party to the contract, for amounts due under the subcontract. Further, IBM is the "prevailing party" in this action since Defendant has been found liable under the subcontract and the only remaining issue is the amount of damages. Thus, the court GRANTS Plaintiff's Motion to the extent that IBM is entitled to reasonable attorney's fees and costs arising from this litigation. The appropriate amount of fees and costs will be determined at a later hearing.

### C. *Plaintiff's Motion to Strike Defendant's Disclosure of Expert Witnesses and Preclude Expert Testimony*

In addition to its Motion for Summary Judgment, Plaintiff seeks to strike Defendant's disclosure of expert witnesses or, in the alternative, preclude Joseph Giden from testifying as an expert. According to Defendant, Giden is expected to testify regarding the "intent of the Federal regulations and how they apply to this case," as well as the surety industry standards, namely the standard custom and practice in raising and addressing surety claims. In light of the fact that the court already adjudicated these Miller Act interpretation and surety issues in the above summary judgment decision as questions of law, the court concludes that Giden's expected testimony is irrelevant to the case since it does not cover the proper amount attributable to "labor and materials" in the extended payment agreement. Consequently, the court GRANTS Plaintiff's Motion to preclude Joseph Giden from testifying as an expert.

### CONCLUSION

For the reasons stated above, the court DISMISSES Defendant's Counter Motion for Summary Judgment, GRANTS in part and DENIES in part Plaintiff's Motion for Summary Judgment and GRANTS Plaintiff's Motion to Strike Defendant Hartford Fire Insurance Company's Disclosure of Expert Witnesses and Preclude Expert Testimony as moot.

IT IS SO ORDERED.