UNITED STATES for the use and benefit of METRIC ELECTRIC, INC., Plaintiff,

v.

ENVIROSERVE, INC. and National Union Fire Insurance Company of Pittsburgh, Defendants.

No. CIV.A.01–10616–GAO.

United States District Court, D. Massachusetts.

Nov. 24, 2003.

John P. Connelly, Peabody & Arnold LLP, Boston, MA, for Enviroserve, Inc., National Union Fire Insurance Co., Pittsburgh, Defendants.

Anthony M. Metaxas, Joel Rosen, Metaxas, Norman ·& Pidgeon, Beverly, MA, Christian H. Pedersen, Beverly, MA, for Metric Electric, Inc, United States for the use and benefit of Metric Electric, Inc., Plaintiffs.

## MEMORANDUM OF DECISION

TIMOTHY BELCHER DYK, Circuit Judge.[1]

The plaintiff in this case, Metric Electric, Inc. ("Metric") asserts claims under the Miller Act (40 U.S.C. § 3133)[2] and Massachusetts Unfair and Deceptive Trade Practices Law (M.G.L. c. 93a, §§ 2, 11) against the defendant surety, National Union Fire Insurance Company of Pittsburgh ("National Union"). The plaintiff has abandoned its claims against the defendant general contractor, EnviroServe, Inc. ("EnviroServe"). The parties agreed to trial without a jury. I make the following findings of fact and rulings of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I. The Parties and the Subcontract

1. The plaintiff, Metric, is a corporation organized under the laws of Massachusetts with a principal place of business in Georgetown, Massachusetts. (Pretrial Order, Agreed Facts p. 6.)

2. The defendant, National Union, is a corporation organized under the laws of Pennsylvania with a principal place of business in New York, New York. (Pretrial Order, Agreed Facts p. 6.)

3. AIG Technical Services, Inc. ("AIG") is the parent company of National Union. (Tr. 1, p. 3, ll. 7–8.)

4. The defendant, EnviroServe, was a corporation organized under the laws of Maryland with a principal place of business in Sykesville, Maryland. (Pretrial Order, Agreed Facts p. 6.)

5. EnviroServe is no longer in business, and Metric does not seek to recover from EnviroServe on any of the claims brought in this action. (Tr. 1, p. 56, ll. 3–12.)

6. On August 24, 1999, the Army Corps of Engineers ("the ACOE") entered into a contract with EnviroServe to renovate a barracks known as Building 15 located at the United· States Army Soldier Systems Center in Natick, Massachusetts ("the Project"). (Pretrial Order, Agreed Facts p. 6; Pl.Ex. 1).

7. On August 24, 1999, National Union agreed to serve as surety for the Project and issued a Miller Act bond ("the bond") in accordance with 40 U.S.C. § 270a (since amended and moved to 40 U.S.C. § 3131) for the sum of $837,946.80. (Pretrial Order, Agreed Facts p. 6; Pl.Ex. 22). The bond stated that the "Surety [National Union] binds itself, jointly and severally with the Principal [EnviroServe], for payment" up to the "full amount of the penal sum." (Pl.Ex. 22.) The bond further provided that it was "for the protection of persons supplying labor and material ... [as] required under the Act ... (40 U.S.C. 270a–270e)." *Id.* at 2.

---

1. Of the United States Court of Appeals for the Federal Circuit, sitting by designation.

2. The 2002 amendments to the Miller Act, Pub.L. No. 107–217, § 1, 116 Stat. 1062, 1148–49 (2002), did not materially alter this provision, which previously appeared at 40 U.S.C. § 270b (2000).

8. On October 5, 1999, Metric entered into a contract ("the subcontract") for $293,406.00 with EnviroServe under which Metric agreed to perform electrical work on the Project. A subsequent change order, executed on March 8, 2000, increased the value of the subcontract to $305,000.00. (Pretrial Order, Agreed Facts p 6.)

9. The subcontract provided in relevant part that:

 a. "The Contractor [EnviroServe] shall pay the Subcontractor [Metric] each progress payment within seven (7) working days after the Contractor receives payment from the Owner [the ACOE]." (Pl.Ex. 1, Art. 11.3.)

 b. "If the Subcontractor persistently or repeatedly fails or neglects to carry out the Work ... or otherwise to perform in accordance with this Agreement and fails within seven (7) days after receipt of written notice to commence and continue correction of such default or neglect ... the Contractor may, after seven (7) days following receipt by the Subcontractor of an additional written notice ... terminate the Subcontract and finish the Subcontractor's Work .... If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work, such excess shall be paid to the Subcontractor, but if such expense exceeds such unpaid balance, the Sub contractor [sic] shall pay the difference to the Contractor." (Pl.Ex. 1, Art. 7.2.1.)

 c. "Based upon applications for payment submitted to the Contractor by the Subcontractor, corresponding to Applications for Payment submitted by the Contractor to the Architect, and Certificates for Payment issued by the Architect, the Contractor shall make progress payments on account of the Subcontract Sum to the Subcontractor ...." (Pl.Ex. 1, Art. 11.1.)

 d. "Provided an application for payment is received by the Contractor not later than the 23rd day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next Application for Payment which the Contractor is entitled to submit to the Architect. The Contractor shall pay the Subcontractor each progress payment within seven (7) working days after the Contractor receives payment from the Owner [the ACOE]." (Pl.Ex. 1, Art. 11.3.)

1. The subcontract did not contain any provision for attorneys' fees in the event of litigation between EnviroServe and Metric. (Pl.Ex. 1.) The bond also did not provide for attorneys' fees in the event of litigation between Metric and National Union. (Pl. Ex. 22.)

## II. Metric's Work on the Project

2. Metric's work on the Project consisted primarily of performing temporary wiring, electrical demolition and repairs and installing conduit. (Pl.Ex. 4, 5 and 6; Tr. 1, p. 81, ll. 21–23; p. 124, ll. 11–12; p. 134, ll. 8–16).

3. On December 13, 1999, Metric began work on the Project. Metric had workers at the site on December 13–15, 21, 23, 27, 29 and 30; January 7 and 24–27; February 14, 16, 17, 24 and 25; March 1, 10, 17, 20–22 and 29; April 3–5, 11, 12, 14, 17–21 and 24–28; May 1–5, 8–12 and 15–18. (Pl. Ex. 16.) Metric's last day working on the project was May 18, 2000. *Id.*

4. When Metric began work on the Project, the Project was already behind schedule. (Tr. 1, p. 199, ll.6–11.) Asbestos abatement and the construction of certain steel-stud wall frames, both necessary predicates to some of Metric's work, had

not been completed before Metric's arrival on the worksite. (Tr. 1, p. 23, ll. 11–20; *Id.* at p. 200, l. 6—p. 201, l. 11). Moreover, the building being renovated was not sufficiently weatherproof and its interior often became wet when it rained. (Tr. 1, p. 23, ll.11–23.) These factors combined were the major cause of delay in Metric's work under the subcontract. (Tr. 1, p. 23 ll. 17–20; *Id.* at p. 201, ll. 12–13).

5. Metric's president, Brian Sampson, decided that the building transformer was unsafe because of standing water in the transformer room. (Tr. 1, p. 23, l.21—p.24, l.9.) Sampson discussed this concern with EnviroServe's project manager, John Adey, who agreed that the building transformer should be removed and that an alternate power source was required. (Tr. 1, p. 24, l.18—p.25, l.3.) Metric acquired a weatherproof transformer from Boston Edison Company (now NSTAR Electric).

6. The ACOE issued two letters dated April 14 and 20, 2000 that complained of specific aspects of Metric's performance. (Def. Exs. 7 and 8). The ACOE issued a third letter on April 21, 2000, complaining of problems with EnviroServe's performance in general on the Project. (Def.Ex. 14.)

7. The April 14th letter from the ACOE to EnviroServe concerned only minor inconsistencies and technical defects in the submission of Metric's payrolls. It did not complain of any material defects in the quality of Metric's work. (Def.Ex. 8.)

8. The April 20th letter from the ACOE to EnviroServe addressed several small deficiencies in Metric's work. (Def.Ex. 7.) The ACOE project engineer on the Project, Steven Chase, concluded that the items listed in that letter were all "minor items." (Tr. 2, p. 98, ll.23–25.) These deficiencies were not material defects in Metric's work. Moreover, National Union did not introduce any evidence that additional costs were incurred to fix these deficiencies, or the amount of any such costs.

9. The April 21st letter from the ACOE to EnviroServe complained of a number of delays on specific aspects of the Project, including delays on work Metric was to perform under the subcontract. Specifically, the letter stated that installation of "electrical ceiling conduit" was several weeks behind schedule. (Def.Ex. 14.) Metric did not cause this delay.

10. Overall, Metric's work substantially complied with specifications, and Metric promptly addressed any deficiencies pointed out by either EnviroServe or the ACOE. (Tr. 1, p. 204, l.3—p.205, l.2.)

### III. Metric's Termination from the Project

1. As of May 18, 2000, the ACOE had approved and released $21,740.00 to EnviroServe for payment of work performed by Metric. (Def. Ex. 6; Tr. 2 at p. 27, ll. 9–23).

2. However, as of May 18, 2000, Metric had not received payment for any of the work it performed on the Project. (Tr. 1, p. 45, l.11—p.46, l.17.)

3. On May 19, 2000, EnviroServe sent Metric a letter explaining that EnviroServe had "experienced a financial setback . . . due to a non-payment issue with" another construction project on which it was working. (Pl.Ex. 14.) This letter stated that in lieu of payment from EnviroServe, "the Army has stepped forward and will be issuing a check to you on the 25th of this month in the amount of $20,000 in an effort to keep our job moving." *Id.*

4. On May 24, 2000, EnviroServe faxed information regarding a meeting scheduled for May 25, 2000, at which Mr. Sampson could pick up the $20,000 check issued by the ACOE. (Def.Ex. 3.)

5. Sampson did not attend this meeting and never received the $20,000. (Tr. 1, p. 64, l.21—p.65, l.15.)

6. On May 25, 2000, Metric made a claim against National Union on the payment bond for $76,341.62, consisting of $36,357.00 for labor, $15,226.30 for materials, $9,490.00 for Boston Edison costs, $9,160.99 for overhead and $6,107.33 for profit. (Pl.Ex. 15 at 2.) Copies of the claim were faxed to EnviroServe and the ACOE. (Tr. 1, p. 93, ll. 14–18.)

7. On May 26, 2000, EnviroServe's president, Mr. Adey, told Mr. Sampson in a telephone conversation that Metric was fired and that the subcontract had been terminated. (Tr. 1, p. 96, ll. 6–7; p. 98, l. 25—p. 99, l. 2). Mr. Adey also caused Metric to be barred from the worksite. *Id.*

8. Also on May 26, 2000, EnviroServe sent Mr. Sampson a default letter ("the default letter"). (Pl.Ex. 19.) The letter listed a number of work items under the subcontract that were behind schedule. *Id.* The delay in completing these items was not caused by Metric. Rather the delay primarily resulted from poor job sequencing by EnviroServe and because the building was not weather-tight. (Tr. 1, p. 23 ll. 17–20; *Id.*, p. 201, ll. 12–13).

9. Darrin Wells, the Construction Quality Control Systems Manager for EnviroServe on the Project, disagreed with Mr. Adey's decision to terminate Metric from the Project. (Tr. 1, p. 210, l.2—p.211, l.5.) On a fax cover sheet sent to Mr. Adey on May 26, 2000, Wells stated that Metric had fixed the problems previously cited by the ACOE in its April 14, 20 and 21st letters to EnviroServe. (Pl.Ex. 23.)

10. On June 14, 2000, the Army terminated its general contract on the Project with EnviroServe. (Pl.Ex. 20.)

11. After EnviroServe's termination, National Union, through its construction consultant, Vertex Engineering Services, Inc. ("Vertex"), contacted Metric and invited Metric to ratify the subcontract and return to the Project. (Tr. 2, p. 120, ll. 4–7; p. 191, l. 25—p. 192, l. 1). Metric declined. (Tr. 2, p. 120, ll. 16–17; p. 192, ll. 6–8).

12. On September 20, 2000, CTA/Harvey, the general contractor hired to replace EnviroServe, executed a contract with Stillian Electric ("Stillian") for $300,000 to replace Metric and complete electrical work on the Project. (Pl.Ex. 26; Tr. 2, p. 195, ll. 11–13).

## IV. The Value of Metric's Claim on the Bond

13. During its time on the Project, Metric submitted three requisitions for payment to EnviroServe in the amounts of $275.00 on February 14, 2000, $11,267.00 on April 21, 2000, and $19,275.50 on May 17, 2000. The first requisition was for emergency labor costs to shut down a water damaged power panel. The second and third requisitions were for electrical demolition and installation of electrical conduit and wall studs. These costs were billed against line items of the subcontract. (Pl. Exs. 4, 5 and 6).

14. The three requisitions did not include the total value of Metric's work because there were no specific line items for the temporary wiring and emergency repairs Metric performed. (Tr. 1, p. 68, ll.3–9.) There was also no line item for the cost of the Boston Edison transformer or increased labor costs due to delay. *Id.* Metric also performed electrical demolition work in excess of the amount designated for demolition in the subcontract. (Tr. 1, p. 181, l.1—p.182, l.5.)

15. The actual value of Metric's material cost on the Project was $15,226.30. (Pl. Ex. 15.)

16. The value of Metric's labor on the Project was $36,357.00. This corresponds to Metric's labor costs in its certified payrolls, Pl.Ex. 16, and includes any increased labor costs allegedly resulting from delay. (Tr. 1, p. 30, l. 22—p 31, l. 4; *Id.*, p. 181, l. 1—p. 182, l. 5).

17. The cost of the Boston Edison transformer was $7,761.70. (Tr. 1, p. 76, ll. 24–25; Pl.Ex. 17).

18. A rate of 15% for overhead is fair and customary in this industry. (Tr. 1, p. 80, ll.18–24.) Overhead represents additional insurance, worker's compensation, worker's benefits and administrative costs borne by a subcontractor. (Tr. 1, p. 80, ll.11–15.) Metric's overhead cost on the material and labor (including the cost of the Boston Edison transformer) actually provided is $8,901.75.

19. A rate of 10% for profit is fair and customary in this industry. (Tr. 1, p. 81, l.3—p.82, l.9.) Metric's profit on the material and labor (including the cost of the Boston Edison transformer) actually provided is $5,934.50.

V. The Investigation of Metric's Claim

20. National Union acknowledged receipt of Metric's claim for $76,341.62 in a letter to EnviroServe dated June 5, 2000. (Pl.Ex. 25.)

21. Initially, Mark Schiavi, an employee of AIG, was responsible for investigating Metric's claim. In January 2001, Susan Hellerman ("Hellerman") a complex claims director for AIG, was placed in charge of investigating Metric's claim, replacing Mr. Schiavi. (Tr. 2, p. 130, l. 18—p. 131, l. 13; *Id.*, p. 132, ll. 21–22).

22. The initial investigation of Metric's claim was delayed because National Union objected to the "proof of claim" form Metric submitted with the May 25, 2000, claim. (Tr. 2, p. 131, l.16—p.132, l.4). Hellerman admitted that there was nothing wrong with the original form submitted by Met-

ric. (Tr. 2, p. 149, l.23—p.150, l.11.) Metric did not prove that it was prejudiced or otherwise injured by this delay.

23. In late October of 2000, National Union delegated investigation of Metric's claim to Vertex. (Tr. 2, p. 196, ll.1–3.) Jon Lemieux ("Lemieux"), a division manager at Vertex, was in charge of investigating the claim. (Tr. 2, p. 187, ll. 18–19.)

24. On December 27, 2000, Lemieux issued a report ("the Vertex report") based on his investigation of Metric's claim. (Pl. Ex. 18.) The Vertex report stated that the value of Metric's labor, materials, overhead and profit minus the Boston Edison costs was $61,899.96. *Id.* at 3.

25. The Vertex report stated that "[r]ecords indicate that Metric was defaulted from the project by ESI [Enviro-Serve]." *Id.* at 2. This statement was based upon Lemieux's review of the May 26, 2000, default letter and the letters issued by the ACOE on April 14, 20 and 21, 2000, (Def. Exs. 7, 8 and 14) addressing the ACOE's problems with Metric's performance. (Tr. 2, p. 198, l. 4—p. 199, l. 18; *Id.*, p. 206, l. 25—p. 207, l. 2).

26. The Vertex report also stated that the "remedies available to Metric vary greatly" depending upon whether or not Metric was justifiably terminated. (Pl.Ex. 18 at 2.) According to the Vertex report, if Metric was "justifiably terminated ... the Surety may withhold funds due to the Subcontractor to cover the loss incurred by completing the project." *Id.* Lemieux stated that the completion cost for the electrical work was the value of the Stillian contract, $300,000, plus an additional $60,000 for the completion contractor's overhead and profit (at 10% each). *Id.* By subtracting $293,406, the value of Metric's original subcontract before the change order, from the estimated completion cost of $360,000, Lemieux computed the loss to the surety to be $66,594. *Id.* Based upon

this estimated loss to the surety, Lemieux concluded that the surety's loss actually exceeded the value of Metric's claim by $4,694.04. *Id.* at 3.

27. Based upon the Vertex report, National Union originally refused to pay Metric anything for its claim and actually told Sampson that Metric owed the surety $4,000. (Tr. 1, p. 95, ll. 6–9.)

28. By March of 2001, Lemieux had contacted CTA/Harvey and determined that it carried only 10% and 5% for overhead and profit, rather than the 10% and 10% he used to calculate the loss to the surety in the Vertex report. (Tr. 2, p. 214, l.11—p.215, l.11.) Based on this information, the adjusted completion cost was $345,000. (Tr. 2, p. 215, ll. 13–14.) Lemieux explained this change to National Union in a follow-up report in March 2001. (Tr. 2, p. 215, ll. 9–11.)

## VI. National Union's Written Settlement Offer

1. On March 16, 2001, National Union made its first written settlement offer ("the offer letter") to Metric for $12,528.85. (Pl.Ex. 21.) Hellerman drafted the offer letter. *Id.*

2. Although almost one year had passed since Metric first made its claim on the bond, National Union's delay in proceeding with the investigation of the claim and attempting to settle it was not unreasonable, especially given the fact that the surety had to take over the Project after EnviroServe's default.

3. In the offer letter, Hellerman explained that National Union had reviewed the claim and determined the total value of the elements of Metric's claim to be $64,122.85. *Id.* Specifically, the offer stated that Metric's labor cost should be reduced by $1,086.00 because of "discrepancies revealed by the payroll records." *Id.* The offer letter also stated that the Boston Edison invoice was actually $1,728.30 less than the amount Metric claimed and that

this amount should be further reduced by $2,500 to reflect the credit given upon return of the transformer. *Id.* Finally, National Union objected to the "exorbitant markup" of 25% that Metric claimed for overhead and profit and offered a total markup of 15% instead. *Id.* No objection was made to the $15,226.30 Metric claimed for materials.

4. The offer letter further stated, "while it is Metric's position that it justifiably walked off the project, it is the surety's position that EnviroServe, Inc. properly terminated Metric's contract when Metric failed to perform in accordance with its subcontract." *Id.* Accordingly, Hellerman explained that National Union believed that the cost to complete the electrical work on the Project could be deducted from the value of Metric's claim. *Id.*

5. The offer letter stated that the surety's cost to complete was $345,000 and that:

> [h]ad Metric completed the work, the cost would have been $293,406.00. Therefore, the loss to the surety was $51,594.00.... Deducting the surety's loss due to Metric's default, $51,594.00 from Metric's claimed loss of $64,122.85, which it alleges was due to EnviroServe's breach of contract, we arrive at a difference of $12,528.85.

*Id.*

6. National Union believed that the statements made in the offer letter were accurate. The offer letter was not an attempt to mislead Metric as to the facts at issue or the provisions of the subcontract or Miller Act bond.

7. National Union's analysis of Metric's claim was erroneous for several reasons.

8. First, National Union wrongly concluded that EnviroServe properly terminated Metric from the Project. This was an incorrect conclusion premised primarily

on the default letter and the April 14, 20 and 21, 2000, letters from the ACOE to EnviroServe; Hellerman never reviewed Mr. Well's note on the May 26, 2000 fax cover letter (Pl.Ex. 23). (Tr. 2, p. 181, ll.6–23.) Metric was not in material default, and EnviroServe had no ground on which to terminate the subcontract.

9. Consequently, National Union was not entitled to deduct its loss to complete the electrical work on the Project from the value of Metric's Miller Act claim.

10. Second, even if the surety had been entitled to deduct its loss, National Union's calculation of that loss was incorrect. The 10% and 5% markups for general contractor overhead and profit should not have been included in calculating National Union's cost to complete because these values were not reflected in the original subcontract with Metric.

11. National Union further erred by using the value of Metric's subcontract prior to execution of the March 8, 2000, change order to calculate its loss. The actual cost to complete the electrical work under Metric's subcontract was $305,000, not $293,406 as stated in the offer letter.

12. Moreover, even assuming that Metric had breached the subcontract, National Union applied the wrong formula to determine its loss. The loss on the contract could not be computed simply by comparing the value of the new subcontract and the Metric subcontract, an approach which led National Union to compute a $51,594 loss and, which Metric now points out, did not produce a loss at all. Rather the language of the subcontract stated that the loss was equal to "the expense of finishing the Subcontractor's Work" in excess of "the unpaid balance of the Subcontract Sum." (Pl.Ex. 1, Art. 7.2.1.) Thus, National Union should have computed the contract price payable to Metric (roughly the amount of the Miller Act claim, or $74,181.25) and deducted this amount from

the Metric subcontract price ($305,000) to yield the "unpaid balance" under the subcontract, an amount equal to approximately $230,818.75. (Pl.Ex. 1, Art. 7.2.1.) The unpaid balance should then have been deducted from the price of the replacement subcontract ($300,000) to yield a computed loss of approximately $69,181.25. This correct analysis would have supported a withholding of approximately $69,181.25 from the value of Metric's Miller Act claim on the (incorrect) assumption that Metric was liable for these excess costs.

13. National Union's liability on the bond was reasonably clear prior to suit and National Union did not conduct a reasonable investigation of Metric's claim because it failed to communicate adequately with the Metric concerning the alleged deficiencies in Metric's work. However, National Union did not act in bad faith or with an improper motive at any time.

## VII. Metric's Response to National Union's Written Settlement Offer

14. Metric did not accept National Union's offer of $12,528.85. Instead on March 19, 2001, Metric's lawyer responded to the Offer in a letter stating that "[t]he premise that underlies your offer is in direct contradiction of the evidence and is vigorously refuted by my client. Accordingly, your offer is unreasonable and not made in good faith." (Def.Ex. 17.)

15. On March 20, 2001, Hellerman responded to Metric's letter and "request[ed] that [Metric] provide us with any information or documentation that you believe supports your client's claim and that you did not previously provide to us." (Def.Ex. 18.)

16. Neither Metric, nor its lawyers, responded to Hellerman's letter. Nor did Metric otherwise attempt to explain what it considered to be errors in the surety's analysis. (Tr. 2, p. 142, l. 2—p.143, l. 21.)

17. National Union offered to submit the dispute to mediation, but Metric refused. (Tr. 2, p. 145, ll. 1–5.)

## PROCEDURAL BACKGROUND

On April 13, 2001, Metric filed this suit against EnviroServe and National Union. As noted above, Metric has made clear that it no longer seeks to recover from EnviroServe and is pursuing its claims solely against the surety. The plaintiff asserts two claims: (1) a claim for the value of its "material and labor" under the Miller Act (40 U.S.C. § 3133), and (2) a claim for attorneys' fees and enhanced damages pursuant to Massachusetts unfair and deceptive trade practices law (M.G.L. c. 93A). This case was originally assigned to Judge O'Toole. Discovery was conducted. On November 13, 2002, National Union made an offer of judgment to Metric in the amount of $50,000; Metric did not accept. After the close of discovery, I was appointed to sit by designation to this case. The parties agreed to waive trial by jury and a two-day bench trial was held on September 9 and 10, 2003. The record was closed as to all issues except attorneys' fees.[3] Post-trial briefs were filed on October 10, 2003.

## DISCUSSION

There are three issues in this case. The first concerns the proper amount of the plaintiff's recovery on the Miller Act bond. The second concerns the plaintiff's claim for attorneys' fees and enhanced damages pursuant to state law under M.G.L. c. 93A. The third concerns the plaintiff's claim for prejudgment interest.

**3.** The parties have not yet fully addressed the amount Metric claims for attorneys' fees. By agreement at trial, the parties agreed to postpone the question of the amount of Metric attorneys' fees pending my decision on the

## I. The Miller Act Claim

■ The Miller Act "was enacted to give those supplying labor and materials for [federal] government construction contracts, protection comparable to that furnished by mechanics' and materialmen's liens where private construction is involved." *Arthur N. Olive Co. v. United States ex rel. Marino*, 297 F.2d 70, 72 (1st Cir.1961); *See also GE Supply v. C & G Enterprises, Inc.*, 212 F.3d 14, 17 (1st Cir. 2000). The Act provides in pertinent part that:

Every person who has furnished labor or material in carrying out work provided fro in a contract for which a payment bond is furnished under section 3131 [formerly section 270a] of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

40 U.S.C. § 3133(b)(1) (2002). A number of Circuits have recognized a subcontractor's ability to recover in quantum meruit under the Miller Act when the defendant contractor has breached the underlying contract. *E.g., United States ex rel. Leno v. Summit Constr. Co.*, 892 F.2d 788, 792 (9th Cir.1989); *United States ex rel. C.J.C., Inc. v. W. States Mech. Contractors*, 834 F.2d 1533, 1539 (10th Cir.1987); *United States ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc.*, 479 F.2d 638, 641, (4th Cir.1973); *see United States*

plaintiff's state law claims. The amount of attorneys' fees no longer needs to be resolved given my decision to deny Metric's claims for attorneys' fees.

*ex rel. Lochridge–Priest, Inc. v. Con–Real Support Group, Inc.,* 950 F.2d 284, 286 (5th Cir.1992). When quantum meruit is appropriate under the Miller Act recovery is not limited to the contract price, but rather the plaintiff may "recover the value of services he gave ... irrespective of whether he would have lost money on the contract and been unable to recover in a suit on the contract." *W. States,* 834 F.2d at 1539 (quoting *Coastal Steel,* 479 F.2d at 641) (alteration in original).

The plaintiff's May 25, 2000 claim on the Miller Act bond was composed of the following elements.

| Material | $15,226.30 |
|---|---|
| Labor | $36,357.00 |
| Boston Edison costs | $ 9,490.00 |
| Overhead (15% of above) [4] | $ 9,160.99 |
| Profit (10% of above) | $ 6,107.33 |
| Total | $76,341.62 |

The defendant, while conceding that Metric is entitled to the reasonable value of its material and labor, argues that recovery should be limited and argues that the plaintiff is not entitled to any recovery for the Boston Edison costs, overhead or profit. I conclude that the plaintiff is entitled to recover $74,181.25 on its Miller Act claim.

### A. Material and Labor

■ In its May 25, 2000 claim, the plaintiff claimed a combined total of $51,583.30 for material and labor. The defendant argues that Metric has failed to specifically show the value of material and labor it supplied. Thus, National Union's position is that Metric's recovery is limited to either $21,740.00, the amount the ACOE had approved for payment at the time of Metric's termination, or $30,817.50, the sum total of the three invoices Metric submitted to EnviroServe. The plaintiff argues that its material and labor figure is higher

than these values because it includes work that had yet to be billed prior to its termination. I find that Metric is entitled to recover the $51,583.30 it has requested.

■ A plaintiff recovering in quantum meruit is entitled to the value of services provided. *C.J.C., Inc.,* 834 F.2d at 1539. The defendant's argument that the value of Metric's labor has not been proven (because the plaintiff cannot show exactly when and by whom work was done) is without merit. The certified payrolls combined with Mr. Sampson's testimony are sufficient to establish the $36,357.00 Metric claimed for the value of its labor.

National Union makes several additional arguments concerning the labor costs claimed by the plaintiff. First, the defendant asserts that the labor claim should be reduced because some of the work performed by Metric was defective. Such a deduction would be appropriate in theory. In Miller Act cases where the plaintiff was allowed to recover in quantum meruit, costs associated with defects in the plaintiff's performance may be deducted from the value of labor and materials otherwise recoverable. *See C.J.C., Inc.,* 834 F.2d at 1540. However, the defendant has failed to show that the amount claimed should be reduced by any amount. The defendant's own witness, Stephen Chase, who was the project engineer for the ACOE on the Project, admitted that the defects were minor and there was no showing that any of the defects experienced were unusual. Also, the defendant has failed to introduce any evidence as to the costs of rectifying the defects. I conclude, therefore, that no deduction should be made for the allegedly defective performance.

---

**4.** Overhead and profit as claimed are 15% and 10% respectively of the total of the Material, Labor and Boston Edison costs.

Second, the plaintiff has stated that its claimed labor costs were increased by about 20% due to work delays. The defendant contends that the claimed labor hours should be reduced by 20% to reflect the increase due to delay. I need not decide whether delay increased labor costs by 20% because again I conclude that the evidence does not support any reduction in the amount of Metric's claimed labor costs. Increased costs attributable to delay are recoverable under the Miller Act so long as the plaintiff did not create the delay. *E.g., Mai Steel Serv., Inc. v. Blake Constr. Co.,* 981 F.2d 414, 418 (9th Cir.1992); *Lochridge–Priest,* 950 F.2d at 287; *United States ex rel. Pertun Constr. Co. v. Harvesters Group, Inc.,* 918 F.2d 915, 918 (11th Cir.1990). Here, I find that Metric did not cause the work delays, and is therefore entitled to recovery for its increased labor costs.

Finally, Mr. Sampson testified that Metric had underbid the job by failing to include the full amount for demolition in the appropriate line item. The subcontract allotted only $7,500 for demolition. Based on the testimony and the evidence in record, I find that the actual value of the demolition work Metric performed to be more than the $7,500 allotted for demolition in the subcontract. The additional cost of this demolition work is reflected in the labor costs of Metric's claim. The defendant urges that these additional costs should be deducted because they would not have been recoverable had the contract been fully performed. I disagree. Recovery in quantum meruit under the Miller Act is appropriate where, as here, the general contractor has breached the underlying contract. *See C.J.C., Inc.,* 834 F.2d at 1539; *Coastal Steel,* 479 F.2d at 641; *See also United States ex rel. Ahern Co., Inc. v. J.F. White Contracting Co.,* 649 F.2d 29, 32 (1st Cir.1981) (favorably citing *Coastal Steel* ). Consequently, Metric's recovery under the Miller Act "is undiminished by any loss which would have been incurred by complete performance." *Coastal Steel,* 479 F.2d at 641.

In its post-trial brief, Metric for the first time argues that it neglected to include the labor costs of its project manager in its original claim and thus, an additional $9,892.67 should be added to bring its total claim to $84,505.69. The defendant, however, was not given a fair opportunity to address this argument because it was not clearly articulated until after trial, and I reject the claim for this reason. Moreover, Mr. Sampson testified that the profit figure in the original claim effectively represented his salary for acting as project manager and electrician on the job. Since the value of his contribution has already been included in profit, it cannot now be added to increase Metric's recovery.

### B. Boston Edison Costs

It is also clear that Metric's recovery on the Miller Act bond includes costs associated with the Boston Edison Transformer. Mr. Sampson testified that the building transformer at the site was unsuitable for use due to standing water. After obtaining the approval of EnviroServe, Metric rented the Boston Edison transformer to provide an alternate source of power. Although the defendant disputes these facts, I credit the testimony of Metric's witnesses on this issue. Therefore, the associated rental costs are properly included in the Miller Act claim. Metric now concedes that the actual bill for the Boston Edison transformer was only $7,761.70 as reflected in the invoice it entered into evidence at trial. (Pl. Prop. Find. Fact and Rul. Law at 7; Pl.Ex. 17). National Union urges that this bill should be further reduced by $2,500 to reflect credit received upon return of the transformer, but the defendant has produced no

evidence of any such credit. Consequently, I find that Metric is entitled to recover $7,761.70 for the Boston Edison costs.

### C. Overhead and Profit

■■■■■ The defendant argues that the Miller Act does not allow recovery of overhead and profit. A Miller Act claimant cannot recover overhead and profit on the unperformed portions of the underlying contract. *See Arthur N. Olive Co.*, 297 F.2d at 72–73. Metric, however, seeks to recover overhead and profit only on the work it has already done. The First Circuit has established that a subcontractor making a claim on a Miller Act bond can recover, in addition to actual labor and material, overhead and profit, but only that which is attributable to work that has been performed. *See id.* ("Out-of-pocket expense is not the limit of the fair value of labor and materials.").

■■■■ The defendant also urges that the plaintiff has failed to "demonstrate with reasonable certainty and specificity the overhead amount" of 15% contained in its claim. (Def. Prop. Find. Fact and Rul. Law at 9, ¶ 5.) However, I credit the testimony of Metric's president, Mr. Sampson, on this matter, (Tr. 1 at p. 79, l. 6—p. 82, l. 20), and find the claimed rates of 15% for

overhead and 10% for profit to be appropriate and customary within this industry.

In summary, Metric is entitled to $74,181.25 for its claim on the Miller Act bond. This figure represents the full value of labor and materials requested in Metric's original claim made on May 25, 2000. The cost of the Boston Edison transformer in that claim has been reduced to reflect the plaintiff's concession as to the actual amount of the Boston Edison costs. Recovery for overhead and profit has also been allowed.[5]

### II. The State Law Claim

#### A.

The plaintiff also seeks recovery for National Union's alleged unfair settlement practices under Massachusetts unfair trade practices law. (M.G.L. c. 93A, §§ 2 and 11). Metric asserts that National Union has violated various provisions of Massachusetts unfair insurance practices law (M.G.L. c. 176D) and that these violations are "persuasive evidence of a violation of M.G.L. c. 93A." (Pl. Post Trial Br. at 6.)

Chapter 176D prohibits certain unfair acts by insurers related to the investigation, settlement and payment of claims.[6] Sections 6 and 7 of chapter 176D give the Massachusetts Commissioner of Insurance the exclusive authority to enforce the pro-

---

5. The overhead and profit values in the original claim were calculated as 15% and 10% respectively of the sum of the material, labor and Boston Edison transformer costs. Given the lower Boston Edison transformer cost, the original overhead and profit figures have been adjusted to reflect this decrease.

6. In relevant part, Chapter 176D provides that the following are unfair claim settlement practices:

 (a) (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

 . . . .

 (d) (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

 . . . .

 (f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

 . . . .

 (*l*) Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

M.G.L. c. 176D, § 3.

visions of that chapter against insurers who engage in certain prohibited conduct. *M. DeMatteo Constr. Co. v. Century Indemn. Co.*, 182 F.Supp.2d 146, 160 (D.Mass.2001). There is no private cause of action under chapter 176D, and a violation of a provision of chapter 176D is not a per se unfair or deceptive act under chapter 93A, section 2. *Id.; Kiewit Constr. Co. v. Westchester Fire Ins. Co.*, 878 F.Supp. 298, 301–02 (D.Mass.1995). However, conduct that violates chapter 176D may also violate chapter 93A, § 2 and a plaintiff may "attempt to state a claim under chapter 93A, section 2 by alluding to conduct that is impermissible under chapter 176D." *M. DeMatteo*, 182 F.Supp.2d at 163.

The plaintiff here primarily alleges four specific provisions of chapter 176D that it argues are "persuasive evidence" of unfair or deceptive acts in violation of chapter 93A. Metric alleges that the defendant: (1) misrepresented pertinent facts or insurance policy provisions relating to coverages at issue (M.G.L. c. 176D, § 3(9)(a)); (2) delayed the investigation or payment of claims by requiring duplicative forms (*See* M.G.L. c. 176D, § 3(9)(1)); (3) failed to conduct a reasonable investigation based upon all available information (M.G.L. c. 176D, § 3(9)(d)); and (4) failed to effectuate prompt, fair and equitable settlement after liability became reasonably clear (M.G.L. c. 176D, § 3(9)(f)).[7]

The first two of Metric's allegations under chapter 176D are without merit. National Union did not, as the plaintiff alleges, "misrepresent pertinent facts or insurance policy provisions relating to coverages at issue" in the March 16, 2001, offer. *See* M.G.L. c. 176D, § 3(9)(a). Metric argues that in the March 16, 2001, offer, National Union made a number of inaccurate conclusions regarding the cost to complete the electrical work on the Project, the scope of its investigation of Metric's claim and the fact that it believed Metric was properly terminated from the Project. Although many of these conclusions were incorrect, there is no indication that the defendant did not believe them to be true at the time. These inaccuracies were certainly not the deliberate misrepresentation of underlying facts that might give rise to a violation of chapter 93A, sections 2 and 11. Furthermore, Metric's argument under chapter 176D, section 3(9)(1)—that payment of its claim was delayed because National Union initially insisted on the completion of a second, duplicative form—simply does not amount to unfairness in violation of chapter 93A, sections 2 and 11. This is especially true where, as here, the plaintiff has failed to show any significant delay or harm as a result.

Whether the plaintiff's other two allegations under chapter 176D amount to viola-

---

**7.** Metric also asserts that National Union has failed to: (1)"acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies (M.G.L. c. 176D, § 3(9)(b))" and (2) "affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed (M.G.L. c. 176D, § 3(9)(e))." (Pl. Post Trial Br. at 7.) I find that these provisions were not violated. The delay in addressing Metric's claim was not unreasonable given the overall situation with EnviroServe and its default as general contractor.

Metric also asserts that National Union violated chapter 176D section 3(9)(g) by compelling Metric "to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds." *Id.* at 10. Here, Metric did recover substantially more than the amount National Union offered prior to trial, but I do not find that this fact, in and of itself, amounts to an unfair act in violation of chapter 93A, sections 2 and 11.

tions of chapter 93A, section 11 is a more difficult question. Metric alleges that National Union violated chapter 93A, section 11 by "refusing to pay claims without conducting a reasonable investigation" and failing to pay when "liability has become reasonably clear." *See* M.G.L. c. 176D, § 3(9)(d), (f). National Union argues that it did not act unreasonably with respect to handling the claim and, in fact, made several good faith attempts to settle that claim such as its March 16, 2001, offer for $12,528.85. The defendant also urges that the amount of liability on the Miller Act claim was not reasonably clear prior to trial.

To be sure National Union made a number of mistakes. First, the defendant should not have relied on the ACOE letters to justify Metric's termination because they did not report any material deficiencies in the plaintiff's performance. Second, the defendant erred in giving too much weight to the allegations contained in the default letter from EnviroServe and should have questioned Metric directly about the allegations in the default letter. Third, the defendant miscalculated the cost to complete the electrical work on the Project. National Union was clearly negligent in making these mistakes. I find that the amount of National Union's liability on the bond was reasonably clear prior to suit and that the defendant failed to conduct a reasonable investigation of Metric's claim because it did not communicate adequately with the plaintiff concerning the alleged deficiencies in Metric's work. I do not find, however, that the defendant acted deliberately in bad faith or with an improper motive.

 A violation of chapter 176D is not a per se violation of chapter 93A, sections 2 and 11, rather conduct in violation of chapter 176D must also be "unfair or deceptive within the meaning of chapter 93A." *M. DeMatteo*, 182 F.Supp.2d at 162.

I doubt that M.G.L. chapter 93A was designed to impose liability under these circumstances. *See Meyer v. Wagner*, 429 Mass. 410, 709 N.E.2d 784, 793 (1999) (holding that an unfair or deceptive act requires more than a finding of mere negligence.); *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 169 F.3d 43, 56 n. 23 (1st Cir.1999) (stating that an "insurance company that denies [a] claim for coverage on the basis of a plausible interpretation of its insurance policy cannot be said to have committed a violation of chapter 93A.") (citing *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 506 N.E.2d 123, 127 (1987)); *cf. Damon v. Sun Co.*, 87 F.3d 1467, 1484 n. 10 (1st Cir.1996) ("[N]egligence can provide the basis for chapter 93A liability, so long as it is paired with an unfair or deceptive act or practice—in other words, negligence plus rascality equals liability.").

### B.

 Ultimately however, I do not decide the merits of Metric's state law claims for failure to pay "without conducting a reasonable investigation" or settle "when liability has become reasonably clear" because I find those claims to be preempted by the Miller Act.

The substance of these state law claims is that the surety failed to pay its Miller Act claim as required by state law, and Metric seeks only to multiply its Miller Act damages and obtain associated attorney's fees. I hold that the Miller Act preempts these state law claims in light of the Supreme Court's decision in *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), which held that the scope of remedies available under the Miller Act is exclusively a matter of federal law.

In *F.D. Rich* the Supreme Court held that "[t]he Miller Act provides a federal

cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." *Id.* at 127, 94 S.Ct. 2157. In that case, a subcontractor on a government project failed to make payments on plywood it ordered from a supplier. *Id.* at 119–20, 94 S.Ct. 2157. The supplier brought a claim under the Miller Act against the general contractor and the surety to recover the value of the plywood it had supplied. The subcontractor also sought attorneys' fees. *Id.* at 121, 94 S.Ct. 2157. The district court awarded the supplier the total amount of its unpaid invoices, but denied its claim for attorneys' fees. *Id.* On appeal the Ninth Circuit held that attorneys' fees should be awarded, construing the Miller Act to allow for an award of attorneys' fees when the policy of the state in which suit was brought allows for recovery of such fees. *Id.* at 126, 94 S.Ct. 2157. The court of appeals reasoned that the Miller Act was intended to substitute for the unavailable state remedy of the lien. Therefore, if state law allowed for the recovery of attorneys' fees, there was no reason for a different rule to apply to federal projects. *Id.* The Supreme Court rejected this argument. It found no congressional intent to incorporate state law to govern the availability of remedies under the Miller Act. *Id.* at 127, 94 S.Ct. 2157. Moreover, the Court held that sureties and other potential parties to a Miller Act suit are better served by a uniform federal rule because these parties often "have little or no contact, other than the contract itself, with the State in which the federal project is located." *Id.* Uniformity was also found to be desirable to avoid inconsistencies within state law and promote predictability for contractors and sureties involved in federal construction projects. *See id.* at 127–28, 94 S.Ct. 2157.

The First Circuit has also recognized, in the context of whether the surety is obli-gated to pay on a bond, that federal law applies to Miller Act claims because of the need for uniform obligations and rights under a Miller Act bond. *American Auto Insurance Co. v. United States ex rel. Luce,* 269 F.2d 406 (1st Cir.1959). In *American Auto Insurance,* the Court of Appeals explained that "[i]t is obvious that the obligation of a surety on a bond furnished under the Miller Act must be determined by federal law." *Id.* at 408. This is because "[a] suit under the Miller Act does not depend upon diversity of citizenship, but is a special, federal right of action." *Id.* Therefore, the meaning and obligations under Miller Act bonds "should not vary from state to state." *Id.* Evidence of Congress's intent to promote uniformity is evident in the text of the Act itself, which requires claims on Miller Act bonds to be brought in federal, rather than state court. 40 U.S.C. § 3133(b)(3)(B); *See Am. Auto Ins.,* 269 F.2d at 408, n. 1. Other Circuits have similarly held that, because prejudgment interest is within the scope of available Miller Act remedies, entitlement to such interest is a matter of federal law. *United States ex rel. Georgia. Elec. Supply Co., Inc. v. United States Fid. and Guar. Co.,* 656 F.2d 993, 997 (5th Cir.1981); *See, e.g., United States ex. rel. Bartec Indus., Inc. v. United Pac. Co.,* 976 F.2d 1274, 1279 (9th Cir.1992); *Lochridge–Priest,* 950 F.2d at 287–88. However, because there was no applicable federal law governing prejudgment interest these courts ultimately applied state law as a "matter of convenience and practicality." *Id.*

■ I understand the Supreme Court's decision in *F.D. Rich* to broadly establish that obligations under the Miller Act, including the consequences of failure to pay a claim on the bond, are to be determined exclusively by federal law.

■ The gist of Metric's claim here is that the failure to make prompt payment

under the Miller Act should lead to recovery of attorneys' fees and enhanced damages. *F.D. Rich* itself expressly holds that the entitlement to attorneys' fees is to be governed by federal law and that under federal law there is generally no right to attorneys' fees.[8] The First Circuit has since confirmed this in *GE Supply v. C & G Enterprises, Inc.*, 212 F.3d 14, 19 (1st Cir.2000) (citing *F.D. Rich*, 417 U.S. at 126–27, 94 S.Ct. 2157). I conclude that federal law exclusively governs the right to attorneys' fees for a Miller Act claim. I see no basis for holding that the right to enhanced damages for failure to pay a Miller Act claim should not also be exclusively governed by federal law.

▇ The plaintiff urges that the Fifth and Ninth Circuits have allowed state law claims based on failure to pay a Miller Act claim. *See, e.g., United States ex rel. Cal's A/C and Elec. v. Famous Constr. Corp.*, 220 F.3d 326 (5th Cir.2000)("*Cal's A/C II*"); *United States ex rel. Varco Pruden Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915 (5th Cir.1998); [9] *K–W Industries v. National Surety Corp.*, 855 F.2d 640, 643 (9th Cir.1988); *See also United States ex rel. Polied Envtl. Serv., Inc. v. Incor Group, Inc.*, 238 F.Supp.2d 456 (D.Conn. 2002). In my view these decisions have too narrowly construed *F.D. Rich*, interpreting it to bar recovery of attorneys' fees only under the Miller Act, but not under state law. *See id.*[10] I disagree with these decisions.

▇ These decisions also fail to recognize the general rule that federal law governs remedies for failure to make pay-

8. The Court in *F.D. Rich* acknowledged the existence of a few exceptions to the general federal rule that attorneys' fees are not recoverable. These exceptions occur when the underlying contract contains a provision providing for fees in the event of litigation or when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich*, 417 U.S. at 129, 94 S.Ct. 2157. Neither of these exceptions is applicable here because the subcontract did not provide for attorneys' fees, and the defendant did not act in bad faith.

9. The Miller Act allows a subcontractor to bring a claim for the value of supplied material and labor against both the surety and the contractor. *See Cal's A/C*, 220 F.3d at 329. The Fifth Circuit has interpreted *F.D. Rich* to allow state-based actions for attorneys' fees to accompany Miller Act claims only against the contractor. That court has not allowed such claims to proceed against the surety, holding that "recovery on the bond must be under the Miller Act." *Cal's A/C*, 220 F.3d at 329 (quoting *Varco Pruden*, 161 F.3d at 919).

10. Other courts have found the decision in *F.D. Rich* to be superseded by the 1988 Amendments to the Prompt Payment Act, Pub.L. No., 100–496, § 9(a)(2), 102 Stat. 2460 (1998). *United States ex rel. Cal's A/C & Elec-tric v. The Famous Constr. Corp.*, 34 F.Supp.2d 1042, 1043–44 (W.D.La.1999) ("*Cal's A/C I*"), *vacated on other grounds*, 220 F.3d 326 (5th Cir.2000); *see also United States ex rel. Don Siegel Constr. Co. v. Atul Constr. Co.*, 85 F.Supp.2d 414, 416 n. 1 (D.N.J.2000) (citing the district court's decision in *Cal's A/C I*). In *Cal's A/C I*, the district court held that even though Congress did not amend the Miller Act, changing the Prompt Payment Act was sufficient to supersede *F.D. Rich* because "both Acts involve regulation of federal construction contracting and subcontracting and [were] intended to grant greater rights to contractors and subcontractors." *Id.* at 1044. However, the 1998 Amendments provide that "*this section* [of the Prompt Payment Act] shall not limit or impair any ... remedies otherwise available to a contractor or a subcontractor in the event of a dispute involving late payment." 31 U.S.C. § 3905(j) (2002) (emphasis added). Thus, the amendments in no way limit the holding of *F.D. Rich*. As the Fifth Circuit in *Cal's A/C II*, when it rejected this portion of the district court's analysis, the text of the 1998 Amendments is clearly limited to one section of the Prompt Payment Act and does not affect the issue of preemption under the Miller Act. *Cal's A/C*, 220 F.3d at 328 ("Any bars to additional remedies erected by the Miller Act are left untouched by § 3905(j).").

ments on obligations created by federal law, and that under such circumstances state law is displaced. *See, e.g., Monessen S.W. Ry. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (holding that the availability of prejudgment interest under the Federal Employer's Liability Act is a matter of federal not state law); *Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 87 L.Ed. 165 (1942) ("When a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation ... [are] federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield."). *But cf., Bank of Am. Nat'l Trust and Sav. Assoc. v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956) (holding that state law governs the rights of private parties with respect to federal bonds).

The preemption of state law is particularly appropriate under the Miller Act. The Miller Act makes no provision for enhanced damages or attorneys' fees for failure to pay Miller Act claims. In light of other federal statutes that do provide for enhanced damages and attorneys' fees, *see e.g.,* Unfair Trade Practices Affecting Producers of Agricultural Products (7 U.S.C. § 2305); the Lanham Act (15 U.S.C. § 1117); the Patent Act (35 U.S.C. §§ 284, 285), Congress's choice to omit such provision in the Miller Act must be viewed as deliberate.

The preemption of federal law here is supported by the fact that applying state law would undermine federal policy. *See Fid. Fed. Sav. and Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) ("[S]tate law is nullified to the extent that it actually conflicts with federal law."). Allowing state law claims for failure to pay would disrupt the balance of rights between the claimant and bonding company that the Miller Act establishes. Allowing such state law claims would also have the potential to increase construction costs for federal government projects by increasing the cost of Miller Act bonds. Finally, allowing state law claims in this area would create a patchwork system under which the rights of claimants would vary substantially from state to state. This result would be contrary to the uniform rules and obligations Congress intended to establish under the Miller Act. *See F.D. Rich,* 417 U.S. at 127, 94 S.Ct. 2157; *Am. Auto Ins.,* 269 F.2d at 408. Indeed, the Fifth Circuit has recognized that allowing state law claims in Miller Act cases "offers a neat sidestep to the broad policy statements of *F.D. Rich.*" *Varco Pruden,* 161 F.3d at 919.

Consequently, state law remedies for failure to make payments required by the Miller Act are barred. Although the First Circuit has not yet directly addressed this question, my holding in this respect is supported by a Maine district court decision holding that state law claims for attorneys' fees and enhanced damages are barred because they impermissibly expand the available federal remedy. *United States ex rel. Great Wall Constr., Inc. v. Mattie & O'Brien Mech. Contracting Co.,* 2001 WL 127663, at *2–3 (D.Me.2001). In that case, the plaintiff brought claims against the Miller Act surety for attorneys' fees, interest and treble damages under Maine's unfair settlement practices law and Massachusetts's unfair trade practices law (M.G.L. c. 93A, §§ 2, 9, 11). *Id.* at *1. The district court noted that the plaintiff sought no substantive relief under these claims, but rather was attempting to expand the scope of its Miller Act remedy. *Id.* at *2–3. Since *F.D. Rich* forbids "filling an alleged gap in the Miller Act with a state law claim" the court dismissed the state law claims. *Id.* at *2.

For the reasons stated above, I conclude that the Miller Act preempts state law that would create additional liability for failure to pay a Miller Act claim. The plaintiff's claims under M.G.L. chapter 93A, sections 2 and 11 and chapter 176D for failing to promptly settle when liability had become reasonably clear and failing to conduct a reasonable investigation are thus preempted and must be denied.

### III. Prejudgment Interest

■ The plaintiff also seeks prejudgment interest on its Miller Act claim. Metric argues that under M.G.L. chapter 231, section 6C[11] it is entitled to interest at a rate of 12% per annum from the date of its claim on the bond. Neither the Miller Act nor any other applicable federal statute provides standards governing the allowance of prejudgment interest on the plaintiff's claim. The First Circuit has previously held that state law governs a claim for prejudgment interest on a Miller Act bond. *Am. Auto Ins.*, 269 F.2d at 411. This case, however, was decided long before *F.D. Rich*, and the court of appeals has not revisited the issue since. Other Circuits have held that "[s]ince prejudgment interest falls within the 'scope of the remedy' available to a Miller Act claimant, it appears that under the authority of *F.D. Rich*, its allowance must be initially determined as a matter of federal law." *Georgia Elec.*, 656 F.2d at 997; *see also Bartec Indus.*, 976 F.2d at 1279. I agree with these courts that under *F.D. Rich* prejudgment interest on a Miller Act claim is a matter of federal law.

■ The First Circuit has previously applied federal common law to the issue of prejudgment interest when there was no applicable federal statute. *Robinson v.*

*Watts Detective Agency*, 685 F.2d 729, 741 (1st Cir.1982). The claim in *Robinson* arose under the Bankruptcy Act (11 U.S.C. § 107(d)(2)(a) (repealed)), which like the Miller Act, did not contain a provision governing prejudgment interest. *Id.* at 742. The First Circuit held that federal law allowed for recovery of interest on damages unless they were "not ascertainable with sufficient certainty" before trial. *Id.* Here the value of Metric's claim was reasonably ascertainable prior to trial. Accordingly, Metric is entitled to prejudgment interest under federal law.

■ The only remaining issue is the rate of interest to be assessed. I am not aware of any decision establishing a federal rate for prejudgment interest, nor has National Union suggested any interest rate aside from the 12% per annum rate allowed by Massachusetts law. In *Colon Velez v. Puerto Rico Marine Mgmt., Inc.*, 957 F.2d 933 (1st Cir.1992), the First Circuit held that a district court may look to state law to set the prejudgment interest rate on damages under a federal cause of action because there was "no federal statute ... fixing a pre-judgment interest rate." *Id.* at 941. The 12% rate fixed by Massachusetts law is perhaps overly generous, but, in the absence of an express federal standard, I exercise the discretion permitted under *Colon Velez* and apply state law as a matter of "convenience." *See, e.g., id.; Georgia Electric*, 656 F.2d at 997; *Bartec Indus.*, 976 F.2d at 1279; *Lochridge–Priest*, 950 F.2d at 287–88. Under M.G.L. chapter 231, section 6C, Metric is entitled to prejudgment interest from May 25, 2000, the date of its first claim on the bond, at the rate of 12% per annum.

11. Section 6C of M.G.L. chapter 231 provides that:
> In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand.

*See Bushkin Assoc., Inc. v. Raytheon Co.,* 906 F.2d 11, 14 (1st Cir.1990) (holding that section 6C is applicable to quantum meruit recovery).

## CONCLUSION

For the reasons set forth above, I find that the plaintiff is entitled to recover $74,181.25 on the Miller Act bond and prejudgment interest at the statutory rate of 12% from the date of demand, May 25, 2000. The plaintiff's claim for attorneys' fees and enhanced damages under M.G.L. chapters 93A and 176D is denied.